IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Civil Action No. **00-cv-2285-JLK**

**GREGORY A. STROCK,**

      Plaintiff,

v.

**USA CYCLING, INC., UNITED STATES CYCLING FEDERATION, INC., and RENE WENZEL,**

      Defendants.

Civil Action Nos. **01-cv-2444-JLK**

**ERICH L. KAITER**

            Plaintiff,

v.

**USA CYCLING, INC., UNITED STATES CYCLING FEDERATION, INC., RENE VENZEL OLESEN (also known as RENE WENZEL), and ANGUS FRASER,**

      Defendants.

**MEMORANDUM OPINION AND ORDER**

Kane, J.

### Introduction

Greg Strock and Erich Kaiter seek tort and contract damages based on allegations that, unknown to them, they were administered steroids while members of the United States junior national cycling team.  Plaintiffs specifically claim negligence, negligence *per se*, negligent misrepresentation, negligent hiring and supervision, negligent

1

misrepresentation causing financial loss, fraud and misrepresentation, and concealment against defendants USAC and Rene Wenzel.  Strock and Kaiter also assert breach of contract and promissory estoppel against defendant USAC only.  Jurisdiction over these cases is uncontested and found pursuant to 28 U.S.C. 1332(a).  Defendants' motions for summary judgment are now before me.  Several evidentiary issues are at issue in conjunction with these motions for summary judgment, as well as claims for attorney fees.

I heard oral argument on April 18, 2006.  Defendants' summary judgment arguments have two prongs, asserting first that Strock and Kaiter's claims are barred by the statute of limitations, and alternatively, that Strock and Kaiter cannot show Defendants' alleged actions caused their injuries.

In resolving these issues, I first consider the motions to strike Strock and Kaiter's evidence that are based on Local Rules of Practice 7.1(A).  Next, I address the statute of limitations and causation arguments as they relate to Strock and Kaiter, respectively.  Finally, I address Defendants' claims for attorney fees.

## Facts

Greg Strock and Erich Kaiter were both members of the United States' junior cycling team in early 1990.  The United States' cycling program is operated by USA Cycling, Inc.[1]  That organization hired Rene Wenzel to be head coach of the junior

---

[1]Although once operated by the United States Cycling Federation (USCF), today the United States' cycling program is run by the USAC after the USAC and the USCF

national team (Junior National Team).  Wenzel served in this capacity for all relevant times in this lawsuit.

In April 1990, the Junior National Team traveled to Europe to train and compete.  Strock rendezvoused with the team shortly thereafter upon his return from racing in Spain.  While in Spain, a local physician prescribed antibiotics to Strock to treat an illness.  When he convened with the Junior National Team, however, Wenzel allegedly gave Strock a substance to be taken in lieu of the antibiotics.  Strock maintains that he inquired of Wenzel about the substance, and Wenzel indicated it was a mixture of extract of cortisone and vitamins.  Strock further asserts Wenzel represented the mixture as safe and legal, and that Wenzel informed Strock he should not question the good judgment of the coaching staff.

Strock's health appeared to improve, and that July he competed in the world championship in Cleveland, England.  There, both Strock and Kaiter allege they were injected up to three times per day with unknown liquids by USAC staff under Wenzel's supervision.  In all, Kaiter maintains he received forty-two to forty-eight injections during the world championship period.  When Strock and Kaiter inquired as to the substance in the injections, Wenzel purportedly told them it was the safe and legal extract of cortisone/vitamin mixture.  Kaiter also claims he followed instructions from Wenzel to take several non-steroidal anti-inflammatory drugs (NSAIDs) such as Motrin each day.

---

merged.  For clarity, and because there is no legal consequence in doing so, I refer to them collectively as USAC.

Following the world championship, in August 1990 Wenzel allegedly gave Strock and Kaiter each a box of twenty ampules of liquid to help them prepare for the upcoming Washington Trust race in Spokane, Washington.  Strock maintains he was injected with the liquid in a hotel room there by USAC coaching staff.  According to Strock, Wenzel implied the liquid was the same extract of cortisone/vitamin mixture Strock had consumed in April and during the world championship.

Around this time, Kaiter began to notice blood in his stool.  He was diagnosed with Crohn's disease several months later in July 1991.  Strock claims he was overwhelmed by illness in March 1991.  After initially suspecting he had HIV or lymphatic cancer, doctors that summer diagnosed him with human parvovirus (B19).  Although Strock subsequently raced with the Amateur Banesto Team, both Strock and Kaiter attribute the end of their elite cycling careers to parvovirus (B19) and Crohn's disease, respectively.  In 1993 Wenzel informed Strock about a rumor Wenzel had doped Junior National Team riders.

Following a bout with depression, Strock matriculated at Indiana University's medical school.  While taking a pharmacology class there in November 1998, Strock claims he learned there was no such thing as "extract of cortisone" that Wenzel had allegedly given him in 1990.  Strock insists this was the first time he had reason to believe he had been administered steroids by USAC coaching staff.  Strock discussed the alleged doping in a nationally televised interview in September 2000.  Kaiter contends this was the first time he learned that he, too, may unwittingly have been administered

steroids.  Strock filed suit on November 17, 2000, and Kaiter followed on December 18,

2001.  Neither Strock nor Kaiter objects to Defendants' assertion their claims are

governed by Colorado's applicable two and three year statutes of limitations.


## Discussion

### *Defendants' Motions to Strike*

To prevent me from considering Defendants' motions to strike, Strock contends

the motions were not filed pursuant to Local Rule of Practice 7.1(A), which states, in

pertinent part,  "[t]he court will not consider any motion, *other than a motion under*

*[F.R.C.P.] 12 or 56*, unless counsel for the moving party . . . has conferred . . . with

opposing counsel . . . to resolve the disputed matter."  D. Colo. Civ. R. 7.1(A)(emphasis

added).

Here, although Defendants' motions were not technically filed under F.R.C.P. 56,

their basis lies in F.R.C.P. 56(e), which requires that evidence used in support or

opposition to a motion for summary judgment be admissible.  See Adler v. Wal-Mart

Stores, Inc., 144 F.3d 664, 671 (10th Cir. 1998)(applying F.R.C.P. 56(e)).  Because

Defendants' motions seek to hold Strock to his burden under F.R.C.P. 56(e), the motions

fall under the umbrella of Rule 56, and Defendants were not required to confer with

opposing counsel before their filing.  Accordingly, I consider Defendants' motions to

strike in the context of summary judgment, resolving the evidentiary disputes in those

motions as they become relevant.

***Defendants' Motions for Summary Judgment***

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In evaluating a motion for summary judgment, the evidence must be viewed, and all reasonable inferences must be drawn, in favor of the non-moving party. Garrison v. Gambro, 428 F.3d 933, 935 (10th Cir. 2005). Nonetheless, where the moving party has shown the absence of a genuine issue of material fact, the burden falls on the non-moving party to demonstrate the existence of a genuine issue for trial using specific facts. Id. A mere scintilla of evidence is insufficient to create a genuine factual dispute. Id. Rather, "an issue of material fact is genuine only if . . . a reasonable jury could find in favor of the nonmovant." Id.

Defendants' summary judgment argument is two-fold.[2] First, Defendants argue Plaintiffs' claims are barred by the statute of limitations. Second, Defendants contend Plaintiffs cannot demonstrate their claims were caused by Defendants' actions. I address these arguments in turn as they pertain to Strock and Kaiter, respectively.

1. Statute of Limitations

Defendants contend Strock and Kaiter each knew, or should have known, the

---

[2]USAC and Wenzel have filed separate motions for summary judgment in Strock's case and one joint motion in Kaiter's. Nonetheless, because Defendants' legal arguments in the Strock case are essentially the same, I do not distinguish between Defendants when addressing the merits of their arguments against Strock.

cause of their injuries more than three years before filing their claims. Defendants claim Strock knew steroids caused his injuries as early as October 1996 when he allegedly admitted to his psychiatrist he had been given steroids by his USAC coaches. Defendants also claim Strock should have known he had been given steroids when he learned of a rumor Wenzel had been doping Junior National Team cyclists.

Defendants urge Kaiter should have known he had been given steroids, and that the steroids caused his injuries, as early as April 1991, when he was diagnosed with Crohn's disease and; 1) knew the exact dosages of Motrin he had been taking; 2) knew his right knee had been injected with cortisone;  3) knew he had been given vials of extract of cortisone; 4) knew he had been given pills, injections, and suppositories, which coincided with his most successful season as a cyclist; 5) knew he had suffered symptoms of stomach pain, dizziness, and rectal bleeding at approximately the same time he took the supplements; 6) knew professional cyclists took illegal performance enhancing drugs; and 7) had been told by Wenzel that all elite cyclists took drugs.

Strock claims he first made the connection between his injuries and the steroids he was allegedly given in November 1998, when, while taking a pharmacology class in medical school, he learned there was no such thing as extract of cortisone. Kaiter asserts he only became aware he had been given steroids in September 2000, when he watched Strock discuss the doping allegations on a nationally televised interview. Moreover, Strock and Kaiter both claim they were under a reduced duty of diligence to discover the cause of their injuries because Defendants had a fiduciary responsibility to care for them.

7

A federal court sitting in diversity applies state law for statute of limitations purposes.  Burnham v. Humphrey Hospitality Reit Trust, Inc., 403 F.3d 709, 712 (10th Cir. 2005).  As a discovery state, a cause of action in Colorado accrues "on the date both the injury and its cause are known or should have been known by the exercise of reasonable diligence."  Salazar v. Am. Sterilizer Co., 5 P.3d 357, 363 (Colo. Ct. App. 2000); Colo. Rev. Stat. § 13-80-108(1)(2005).  Where a fiduciary relationship exists between the plaintiff and the defendant, however, the plaintiff's expected level of diligence in discovering an injury and its cause is relaxed.  Lucas v. Abbott, 198 Colo. 477, 481, 601 P.2d 1376, 1379 (1979).

The questions of when a cause of action has accrued, whether reasonable diligence has been exercised, and whether a fiduciary relationship exists are normally for the factfinder.  Salazar, 5 P.3d at 363-64 (accrual date); Morgan v. Dain Bosworth, 545 F.Supp. 953, 955 (D. Colo. 1982)(reasonable diligence); see United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd., 946 F. Supp. 861, 871 (D. Colo. 1996)(fiduciary relationship). Nonetheless, "if the undisputed facts clearly show that a plaintiff discovered, or reasonably should have discovered, the negligent conduct as of a particular date, the issue may be decided as a matter of law."  Salazar, 5 P.3d at 363-64.  To the extent the undisputed facts must be clear as to when a plaintiff's cause of action accrued, "suspicion of a possible connection does not necessarily put a reasonable person on notice of the nature, extent, and cause of an injury."  Id. at 363.

Strock and Kaiter successfully demonstrate the existence of a genuine issue of

material fact as to when their causes of action accrued.  As a threshold matter, a fact question exists as to whether Defendants' actions formed a fiduciary relationship with Strock and Kaiter.  Plaintiffs set forth the affidavit of Robert Bills as evidence of a fiduciary relationship.  Among other facts, Bills attests that a National Team coach such as Wenzel is "in a position of trust, if not absolute power" over members of the Junior National Team.  (Strock Br. in Opp'n to Mot. Summ. J. Ex. 10, Bills Aff. ¶ 8, Jan. 22, 2002.).  Defendants contest the admissibility of the affidavit on grounds of hearsay, lack of authentication, and that it is not based on Bills' personal knowledge.  This argument is not persuasive.

As a cycling coach since 1983, and as Wenzel's predecessor as head coach of the Junior National Team from 1988 until Wenzel's hiring, Bills would have personal knowledge of the team and the nature of the coach/cyclist relationship.  Further, Bills recruited Strock and, after Wenzel took over as coach, was promoted to National Team Coordinator.  In that capacity Bills was at least partially responsible for the Junior National Team, having organized the road race leading up to selection of the 1990 Junior World Team.  Further, USAC officers sought his counsel after concerns arose regarding Wenzel's coaching performance.  Not only does Bills attest to his personal knowledge of these facts, and the nature of the relationship between coach and cyclist, but he authenticates the affidavit with his signature.  Moreover, because Defendants do not contest the portion of Bills' affidavit addressing the nature of the coach/cyclist relationship, the extent to which hearsay may exist elsewhere in the affidavit is irrelevant

to the fiduciary duty inquiry.  Accordingly, the Bills affidavit is admissible for my

consideration on summary judgment, and it creates a genuine issue of material fact as to

whether Defendants and Plaintiffs were in a fiduciary relationship.

Due to the material factual dispute concerning the existence of a fiduciary

relationship, it is impossible to know whether I must view the accrual evidence under a

relaxed standard of reasonable diligence.

However, even assuming the relaxed standard of reasonable diligence does not

apply, a genuine issue of material fact precludes summary judgment.  First, the weight to

be given the progress note written by Dr. Murphy and used to show Strock knew he had

been given steroids is disputed.  Although the note indicates Strock said "his coaches

'took advantage of [him]' by giving him performance-enhancing drugs, mainly steroids,"

Dr. Murphy testifies in his deposition that he is not sure whether he mentioned steroids in

the progress note because Strock told him he had received steroids, or if he merely did so

after drawing an inference based on the essence of Strock's conversation with him.

Accordingly, the weight to be given the progress note is in dispute, and Defendants'

evidence does not clearly show Strock knew he had been given steroids before his

November 1998 pharmacology class.

Further, a jury could conclude it was reasonable for Strock not to know he had

been given steroids based on the rumor Wenzel had been doping members of the Junior

National Team.  Strock investigated the veracity of the rumor by contacting at least three

USAC officers who each affirmed Wenzel's assessment that it was false.  (Strock Br. in

Opp'n to Mot. Summ. J. Ex. 2, Strock Dep. 355-362, Sept. 11, 2001.).  Under these circumstances, a jury must resolve the factual issue of whether Strock's investigation was reasonably diligent, and thus whether Strock should have known he had been given steroids based on the rumor.

Defendants cite the case of Ayon v. Gourley, 47 F. Supp. 2d 1246 (D. Colo. 1998), as dispositive of the reasonable diligence issue, however, Ayon is distinguishable. There, relying chiefly on a laundry list of admissions showing the plaintiff knew of his injury and its cause at least six years before he claimed he did, the judge held the statute of limitations had expired in spite of the defendant's fiduciary relationship with the plaintiff.  Here, on the other hand, Defendants present no clear evidence that Strock knew the cause of his injury before November 1998.  Moreover, to the extent Strock attended medical school and may have gained special knowledge of steroids, such knowledge is imputed to him only after he allegedly gained it - in November 1998.  Thus, whether Strock exercised reasonable diligence in investigating the truth of the Wenzel doping rumor must be resolved by the jury.

Kaiter's case is even less clear as to when he discovered, or should have discovered, the cause of his injuries.  Assuming the temporal connection between his injuries and the supplements he knowingly received, including at least one shot of cortisone, the evidence is not sufficient to conclude clearly he should have been on notice of a cause of action under these circumstances.  Kaiter claims he suffered damage as a result of *unknowingly* being administered substances containing illegal and harmful

11

steroids.  (Kaiter  Compl. ¶ 32.; Kaiter Resp. to Mot. Summ. J. ¶ 93.).  Thus, the discovery inquiry must focus on when he knew, or should have known, he had been given harmful steroids such as those purportedly contained in the "extract of cortisone." Although Kaiter knew he received NSAIDs and at least one shot of cortisone in his knee, Defendants present no evidence Kaiter knew he had been given the steroids at issue until Kaiter watched Strock's television interview in September 2000.  Accordingly, Defendants have not met their burden of showing the absence of a genuine issue of material fact on the statute of limitations question regarding Kaiter.

Because a genuine issue of material fact exists as to when Strock and Kaiter knew or should have known the cause of their injuries, summary judgment is not appropriate on Defendants' statute of limitations theory.  Defendants' motions on these grounds are hereby DENIED.

2.  Causation

Defendants assert Strock and Kaiter have failed to present sufficient evidence demonstrating Defendants' actions caused their injuries.  I address these arguments as they apply to Strock and Kaiter, respectively.  Before doing so, however, I set forth the evidentiary standard of causation relevant to Plaintiffs' claims.[3]

---

[3]Plaintiffs rely on the causation standard set forth in Kaiser Found. Health Plan of Colo. V. Sharp, 741 P.2d 714 (Colo. 1987), which I analyze in detail in the body of this Order.  Although Defendants do not object to the Sharp causation standard, I will nonetheless permit argument on this discrete legal issue during the jury instruction phase of this case.

Although a federal court sitting in diversity applies a federal standard when assessing the sufficiency of evidence presented at summary judgment, supra, at 6 (citing Gambro, 428 F.2d at 935)(dispute genuine only if evidence is such that a jury could find in favor of the nonmovant at trial), the benchmark against which the quantum and quality of such proof is measured is dictated by the substantive law at issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254-55 (1986). Here, Plaintiffs' claims are based on Colorado tort and contract law.

Each of Plaintiffs' claims, including negligence, fraud, concealment, and breach of contract, share the common element of causation.[4] Redden v. SCI Colo. Funeral Serv., Inc., 38 P.3d 75, 80 (Colo. 2001)(negligence); Nelson v. Gas Research Inst., 121 P.3d 340, 344 (Colo. Ct. App. 2005)(fraud); Smith v. Boyett, 908 P.2d 508, 512 (Colo. 1995)(concealment); W. Distrib. Co. v. Diodosio, 841 P.2d 1053, 1058 (Colo. 1992)(breach of contract). To prove causation in Colorado, "the plaintiff must show by a preponderance of the evidence that the injury would not have occurred but for the defendant's . . . conduct." Kaiser Found. Health Plan of Colo. v. Sharp, 741 P.2d 714, 719 (Colo. 1987). This standard neither requires the plaintiff to prove causation to a mathematical certainty, nor does it dictate a showing that the defendant's actions were the

---

[4]Although I do not address the issue here, this analysis also applies to Plaintiffs' promissory estoppel claim to the extent causation may be an element there. Moreover, because Defendants challenge causation only, I assume for purposes of summary judgment that all other elements of Plaintiffs' claims such as duty, breach, and injury, for example, are present.

only cause of the plaintiff's injury.  See id.  Rather, the plaintiff must demonstrate "such facts and circumstances as would indicate with *reasonable probability*" that, but for the defendant's acts, he or she would not have suffered harm.  Id. (internal quotations and citations omitted)(emphasis added).  Id.  Mere speculation or possibility that the defendant's acts caused the plaintiff's injury does not show a probability of causation. Id.

## A.  Strock

As to Strock, Defendants point to the deposition testimony of his treating physician, Dr. Bailey, and his treating psychiatrist, Dr. Murphy, who affirmatively indicate steroid use could not have caused either the parvovirus (B19) infection or depression, respectively.  Based on this evidence, I conclude Defendants have met their burden of showing the absence of a genuine issue of fact as to causation.

In an effort to demonstrate a genuine issue exists on causation, Strock responds with an email from Dr. Bailey in which Bailey states, "I really do suspect that your adenopathy, malaise, fever, etc. were related to immunosuppression caused by chronic steroid exposure."  (Strock Br. in Opp'n to Mot. Summ. J. Ex. 30, Bailey Email, Apr. 11, 2001.).  Further supporting his causation argument, Strock cites deposition testimony from Dr. Joyner, an expert report from Dr. Johnson, two expert reports from Kathey Verdeal, Strock's own deposition testimony and affidavit, deposition testimony from Dr. Reilly, as well as portions of Wenzel's deposition testimony and the Bills affidavit.

14

(Strock Br. in Opp'n to Mot. Summ. J. 29-30; Summ. J. Hr'g Tr. 72-79, Apr. 18, 2006).

Of the aforementioned evidence, Defendants seek to strike Dr. Bailey's email as inadmissible hearsay, portions of Dr. Joyner's deposition testimony as inadmissible hearsay, Verdeal's expert reports for failure to authenticate, and the Bills affidavit for authentication and hearsay reasons.  I address these issues in turn.

First, I grant in part the motion to strike Dr. Bailey's email.  Although as hearsay the email may not be used to prove the truth of the matter asserted - that steroids indeed caused Strock to contract parvovirus (B19) - it may be admissible for other purposes, such as impeachment of Dr. Bailey's credibility.  See, e.g., Fed. R. Evid. 613(b).

Second, I grant Defendants' motion to strike Dr. Joyner's testimony regarding Lisa Voight's comments to him about Wenzel's termination from USAC.  Strock has not objected to these arguments in his response to Defendants' motion, and I therefore conclude he has conceded the point.

Third, in an abundance of caution, I deny Defendants' motion to strike Verdeal's expert and supplemental reports.  Unsworn expert reports are not competent evidence and may not be considered for summary judgment purposes.  Sofford v. Schindler Elevator Corp., 954 F. Supp. 1459, 1462-63 (D. Colo. 1997).  Here, Strock failed to file Verdeal's authenticating affidavit until well after the pleadings surrounding summary judgment and the motions to strike in his case had been submitted.  Specifically, Verdeal's authenticating affidavit was filed on October 23, 2003, and then only in Kaiter's case.  (Kaiter's Resp. to Joint Mot. to Strike Exhibits Ex. C).  Nonetheless, acknowledging my

15

Order of March 14, 2002 whereby I consolidated Strock's and Kaiter's cases for purposes of discovery, and because I can ascertain no prejudice on the part of Defendants in light of the overarching policy favoring trial where genuine issues of material fact exist, see Liberty Lobby, 477 U.S. at 255,[5] I consider the Verdeal reports authenticated for purposes of evaluating whether a genuine issue exists on causation.

Finally, for reasons I have previously stated, the Bills affidavit is acceptable for my consideration on summary judgment.  As relevant here, I consider the portion indicating several National Team riders dropped out of competition in 1991, because Bills would have had personal knowledge of such facts.  (Bills Aff. ¶ 10).

In accordance with the above evidentiary rulings, I set forth the facts I may use in deciding whether a reasonable jury could find in Strock's favor on causation:

1.  In his deposition, Joyner opines that the long-term administration of cortisone "can cause probably a decreased immune response," and "can exacerbate" certain infections.  Joyner further indicates that cortisone is a corticosteroid and a "well-known immunosuppressant."  (Strock Br. in Opp'n to Mot. Summ. J. Ex. 7, Joyner Dep. 211:17-212:15, 222:24-223:1)(emphasis added).

2.  Dr. Johnson states in his expert report, in pertinent part:

It is my opinion that Mr. Strock's response to the administration of corticosteroids present in the extract of bovine adrenal gland he was given (initial improvement followed by worsening symptoms) is typical of the

_____

[5]To the extent Defendants would have lodged a hearsay objection to the Verdeal reports, I consider only the nonhearsay portions of Verdeal's reports in my analysis.

16

effects produced by corticosteroid hormones.  The anti-inflammatory actions to reduce arthritic pain occur within hours, whereas the suppression of the immune system from chronic administration usually becomes apparent later (days to weeks).  The data obtained from study of Mr. Strock's serum antibodies at the University of California Medical Center in San Diego in June, 1991, suggest that the viral infection that he had developed the previous year was caused by human parvovirus B19.  This virus is known to produce arthritis with pain and swelling of the joints, especially in individuals with impaired immune function, such as diabetics or individuals who have taken corticosteroids.

In addition to impairment of the immune system, corticosteroid administration can cause myopathy, a weakening of the muscles, that can also decrease athletic performance.  This could have contributed to Mr. Strock's declining athletic ability . . . . [T]he combined effects of the corticosteroid hormones on Mr. Strock's immune system and musculo-skeletal system could have impaired his ability to perform at the top-level after 1991.

(Strock Br. in Opp'n to Mot. Summ. J. Ex. 13, Dr. Johnson Expert Op. ¶¶ 12, 13, January 21, 2002).

3.   Kathey Verdeal indicates in her expert report, to a reasonable degree of toxicologic probability, that:

a.  In 1990, Surelen (the substance allegedly administered to Strock) contained extract of "whole bovine adrenal glands"; (Strock Br. in Opp'n to Mot. Summ. J. Ex. 11, Kathey Verdeal Expert Rep. 2, January 21, 2002).

b.  Adrenal extract contains "corticosteroids, androgen-anabolic steroids, and stimulants."; id.

c.  "The effect of [corticosteroids, androgen-anabolic steroids, and stimulants] can be on immediate athletic performance, as well as long term adverse health

17

effects."; <u>id.</u>

4.  Kathey Verdeal further indicates in the supplement to her expert report that:

a.  "Extracts of . . . animals are associated with risks when injected into, or administered orally to humans."; (Strock Br. in Opp'n to Mot. Summ. J. Ex. 12, Kathey Verdeal Supp. to Expert Rep. 2, January 29, 2002).

b.  "[E]xtracts . . . contain multiple chemical substances.  These substances together can exert additive and supra additive effects. . . .  The effect of the extract, in total, can be quite significant compared to the quantitative value of a single substance in the extract such as cortisone, testosterone, or epinephrine."; <u>id.</u>

c.  at least one "adrenal cortical extract product" was contaminated with bacteria; <u>id.</u>

d.  "Viral contamination is of toxicologic concern with the use of non human animal products in humans."  At least one such product is known to have been contaminated with "porcine parvovirus" and the "theoretical risk of human infection from porcine parvovirus caused a change in manufacturing" procedures for that product after 1996; <u>id.</u>

e.  Corticosteroids produced in the adrenal cortex "cause changes in the body."; <u>id.</u> at 3.

f.  Androgen, a corticosteroid, is anabolic and causes "protein build up everywhere in the body, especially in the muscles";  (Verdeal Supp. Rep. 3).

g.  "Chemical substances" like corticosteroids and anabolic steroids have side

effects that "are harmful and can alter the normal function of the body through feedback and other mechanisms."; <u>id.</u> at 4.

h.   Stress hormones, such as cortisol, "can cause an internal environment that facilitates immunosuppression, and in that sense, stress hormones are toxic."; <u>id.</u>

i.   Banned substances like steroids "put the life, health, and well-being of the athlete at great risk, by pushing them beyond that edge and their natural performance abilities" and are "essentially toxic."; <u>id.</u> at 5.

j.   "The stress of long-term exercise, heavy exercise, and anxiety can render an athlete susceptible to the development of a cold or the flu, or other adverse health states.  In these instances, the performance enhancing substances are even more detrimental," and "are rendered even more toxic to the system."; <u>id.</u>

k.   "Taking away [Strock's] legal therapeutic antibiotics, diminished his ability to recover [from the illness he suffered in Spain before meeting the National Team in France], and be better able to perform during the race, as well as be better able to physiologically handle the stress of training and competition."; (Verdeal Supp. Rep. 5).

l.   The steroids contained in Surelen "masked the illness of Gregory Strock, added stress, and taxed his weaken [sic] immune system to the point that he developed chronic problems which wax and wane over time."; <u>id.</u>

m.   "Toxicologically, the timing of Gregory Strock's demise [sic], in view of the other evidence is compelling."; <u>id.</u> at 6.

19

n. "It is my toxicologic opinion, to a reasonable degree of probability, that Rene

Wenzel a [sic] Coach of the USAC and USCF . . . , harmed Gregory Strock's

health and athletic career . . . , by terminating [Strock's] use of his prescription

antibiotic, replacing it with banned and toxic performance enhancing substances,

and influencing him to compete under those conditions."; <u>id.</u>

5.   Strock attests in his affidavit:

[The steroids] suppressed my immune system, making me more vulnerable
to contracting parvovirus, and other infectious agents, and/or made an
existing infection much more severe than I would otherwise have
experienced without these harmful substances.  Furthermore the direct
interactions of these toxic substances with my body could have produced
some, if not all, of the signs and symptoms I experienced which ruined my
cycling career.  But for my having been doped, without my knowledge, and
lied to about these substances, I would not have suffered the devastating
effects which ended my cycling career.

(Strock Br. in Opp'n to Mot. Summ. J. Ex. 31, Strock Aff. ¶¶ 4, Feb. 2, 2002).

6.   Dr. Reilly testifies that,

most people who know more about this than I do would tell you that there
is some increased risk [of immunosuppression] at any dose of exogenous
corticosteroids.  And you need to be on them for a period of time . . .
probably best expressed in days or weeks to be at increased risk . . . .

(Summ. J. Hr'g Tr. 77)(citing Kaiter Br. in Opp'n to Joint Mot. Summ. J. Ex. 45, Reilly
Dep. 50:17-51:2, July 9, 2002).

7.   Wenzel testifies he knew of two other National Team cyclists who became ill

around the same time as Strock.  (Strock Br. in Opp'n to Mot. Summ. J. Ex. 3, Wenzel

Dep. 188:19-190:25, Oct. 24, 2001).

8.  Bills indicates in his affidavit that "[o]f the approximately 14 most elite 1990 USCF Junior National Team cyclists all but one seemed to disappear from the sport the following year (1991)." (Bills Aff. ¶ 10).

Viewing the above evidence in the light most favorable to Strock, I conclude he has demonstrated a reasonable jury could find the steroids Defendants allegedly gave him probably caused his injuries.  I reach this conclusion while acknowledging much of Strock's evidence is insufficiently probative.  For example, Dr. Johnson's opinion that corticosteroid use "could have" contributed to Strock's declining ability, (Dr. Johnson Expert Op. ¶ 13), and "could have" impaired his ability to compete after 1991, id., is an example of a mere possibility of causation which at least two Colorado courts have determined falls short of the reasonable probability threshold.  See Lamme v. Ortega, 129 Colo. 149, 154, 267 P.2d 1115, 1118 (Colo. 1954)(plaintiff's causation burden not met by showing injury "might have" resulted from defendant's acts)(quoting Brown v. Hughes, 94 Colo. 295, 30 P.2d 259, 263 (1934)); See also Salazar v. Am. Sterilizer Co., 5 P.3d 357, 364 (Colo. Ct. App. 2000)(inferring diagnoses that patient "could" have had a particular medical condition insufficient to place her on notice of cause of action).

Nonetheless, in spite of the shortcomings noted above, and ignoring for now obvious reliability concerns pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), Strock's evidence permits the inference that it is reasonably probable steroids caused Strock's injuries.  For example, Dr. Verdeal's report, buttressed by the testimony of Dr. Joyner and Dr. Reilly, shows administration of steroids in any

21

dosage suppresses the immune system, especially where an elite athlete like Strock has been under severe stress from training and competition.  Further, based on portions of Dr. Johnson's report, Verdeal's supplemental report, Strock's affidavit,[6] and circumstantial evidence from the Bills affidavit, a jury could reasonably infer Strock's immune system was probably suppressed by the steroids, which in turn caused him to contract parvovirus, ultimately ending his elite cycling career.

Accordingly, Strock has met his burden of demonstrating a genuine issue for trial on causation, and summary judgment is hereby DENIED.

## B.  Kaiter

Defendants demonstrate the absence of a genuine issue of causation by showing how each injury Kaiter claims to have suffered could not have been caused by the steroids Defendants allegedly administered to him.  For example, to indicate they could not have caused Kaiter's lung infection Defendants point to the testimony of Dr. Reilly, Kaiter's treating physician for his lung condition, in which Dr. Reilly affirmatively indicates the lack of a causal link between the steroids Defendants allegedly gave Kaiter and his lung disorder.  Likewise, Dr. Kramer testifies there is no causative link between the steroids at issue and Kaiter's Crohn's colitis.  Based on this showing, I conclude Defendants have met their burden of exhibiting a lack of a genuine issue regarding

---

[6]Strock has designated himself as an expert and Defendants have lodged no objection.  Accordingly, even if a valid objection to his affidavit and testimony may exist, I do not consider it at this time.

causation.

Kaiter attempts to establish a triable issue of fact on causation by citing the deposition testimony of Dr. Reilly, Dr. Rabb, Dr. Joyner and Dr. Kramer, as well as the deposition testimony and September 2003 affidavit of Dr. Johnson, and the expert reports of Kathey Verdeal and Dr. Weiner.

Defendants urge me to strike much of the above evidence, and I address these issues in turn.

First, Defendants seek to strike Dr. Johnson's affidavit stating, in pertinent part:

> [I]t is my opinion to a reasonable degree of medical certainty that the course of the lung infection suffered by Erich Kaiter through early 1991 and diagnosed in the Spring of 1991, was aggravated as a result of the corticosteroids administered to Mr. Kaiter by the defendants.

(Pl. Kaiter's Br. in Opp'n to Mot. Summ. J. Ex. 13h, Johnson Aff. ¶ 2, Sept. 3, 2003.).

Defendants argue the affidavit offers only conclusory opinions and lacks sufficient detail to create a genuine issue of fact regarding the cause of Kaiter's lung infection. Alternatively, Defendants contend the affidavit contradicts Dr. Johnson's previous deposition testimony and creates a sham fact issue that must be disregarded.

Defendants' position is not persuasive. Primarily, without conclusively ruling on the admissibility of the September 2003 affidavit at this time, I note it states on its face an ostensibly valid basis by which Dr. Johnson reaches his conclusion (review of both Strock's and Kaiter's medical records as well as other expert reports). In this context, whether the opinion offered in Dr. Johnson's September 2003 affidavit is conclusory is

23

an issue more appropriately addressed in a <u>Daubert</u> hearing, at which time I could more thoroughly evaluate the basis of Dr. Johnson's opinion.  Further, contrary to Defendants' assertion, Dr. Johnson's affidavit does not directly contradict any testimony in his deposition.  Thus, I consider it in determining the sufficiency of Kaiter's causation evidence.

Second, Defendants seek to strike Dr. Johnson's expert report because it only pertains to Strock and is therefore irrelevant to whether the alleged steroids injured Kaiter.  This argument also fails because, although Dr. Johnson's expert report pertains to Strock, it is probative of whether steroids caused the injuries Kaiter experienced as well.  As such, I consider it as part of Kaiter's causation showing.

Third, Defendants seek to strike the deposition testimony of Dr. Joyner because the deposition was not taken specifically for this case.  Defendants' argument is without merit for the same reason I denied their objection to Dr. Johnson's expert report.  Specifically, Kaiter uses Dr. Joyner's testimony to show a causal connection between steroids and a depressed immune system, which is relevant to the causation issue.  I therefore consider Dr. Joyner's testimony in the summary judgment context.

Fourth, Defendants again seek to strike Kathey Verdeal's expert report and supplemental report for failure to authenticate.  However, as I have already noted, Kaiter has properly authenticated the Verdeal reports by way of affidavit attached to his response to Defendants' motion to strike.  (Kaiter's Resp. to Joint Mot. to Strike Exhibits Ex. C).  Accordingly, as with Strock, I consider both Verdeal reports in regard to Kaiter's

24

causation argument.

Based on the evidence available for my consideration, I conclude Dr. Johnson's September 2003 affidavit is sufficient to satisfy Kaiter's burden of showing a genuine issue exists regarding the cause of Kaiter's lung injury.

Kaiter fails to demonstrate, however, that a jury could find Defendants' acts probably caused his other injuries.  At the threshold, Kaiter concedes he cannot prove Defendants caused any injury except his Crohn's colitis and lung condition.  (Summ. J. Hr'g Tr. 87).  Thus, all claims of injury other than his Crohn's colitis and lung infection have been waived and cannot form a causative link to Defendants.

Kaiter's causation evidence is generally set out in his opposition brief at paragraphs 24, 26, 30, 55-65, 90, and 91.  Even assuming the evidence used in the text of Kaiter's brief is true, this evidence is not probative to a reasonable probability that the steroids allegedly administered to Kaiter caused his Crohn's manifestation.  <u>See, e.g.</u>, (Kaiter's Br. in Opp'n to Mot. Summ. J. ¶ 65)("Moreover, corticosteroids suppress the immune system, increasing the risk of infections, which in turn, *may* lead to the manifestation of Crohns [sic] colitis.")(emphasis added).

Kaiter's causation evidence fails because he focuses more on the role NSAIDs, rather than steroids, played in causing his Crohn's manifestation.  <u>E.g.</u>, (Johnson Dep. 122:2-6; Weiner Dep. 119:6-11; Dr. Johnson Expert Rep. 1, Jan. 14, 2003).  As I noted in my Order of April 6, 2006, evidence of a link between NSAIDs alone and Crohn's would likely subject Kaiter's claim to dismissal on statute of limitations grounds because Kaiter

knew he was given NSAIDs in 1990.

To the extent Kaiter attempts to implicate steroids as a cause of his Crohn's manifestation, however, this evidentiary showing is insufficient.  While Kaiter sufficiently demonstrates steroids suppress the immune system, (Reilly Dep. 50:17-51:2; Johnson Dep. 111:1-4, June 12, 2003; Weiner Dep. 61:7-62:4, June 5, 2003), and increase NSAID toxicity when the two substances are used together, (Kramer Dep. 27:6-16, July 9, 2002), Kaiter simply fails to demonstrate how steroids probably caused his Crohn's manifestation.

At best, Kaiter's evidence shows that the steroids *may have been* a cause of his Crohn's.  For example, Dr. Weiner testifies in his deposition that,

> you could make the argument that the glucocorticoids had affected his immune system in such a way that he was predisposed to any number of infections, not necessarily a colonic infection, but bronchitis, sinus infection, or some other type of infection that then led to his immune system - you know, then tweaking his immune system in such a way that it would then be more prone to form - causing Crohn's, so it's a double-edged sword in that regard.
>     [Steroids] can actually suppress the inflammation, but it can suppress the immune system too - or alter the immune system in such a way that [Kaiter] *could have* gotten an infection that then spilled over into his bowels.

(Weiner Dep. 61:12-62:4)(emphasis added).  Even assuming the above opinion is probative of a probability steroids caused Kaiter's Crohn's manifestation, shortly after making the above comment, Weiner indicates that his opinion was based on speculation because he did not know the steroid dosage Kaiter allegedly received.  Id. at 63:10-12.  Any probativity in Dr. Weiner's statement is thus minimized.

Another example of how Kaiter fails to provide probative evidence connecting steroids to Kaiter's Crohn's manifestation is Dr. Johnson's deposition testimony agreeing with plaintiff's counsel that an infection caused by the steroids allegedly given to Kaiter merely "*could* lead to a triggering mechanism for his Crohn's disease[.]" (Johnson Dep. 127:19-21)(emphasis added).  The same problem exists with Kaiter's expert, Dr. Weiner, as demonstrated by Dr. Weiner's agreement with the statement from plaintiff's counsel that  "[y]ou describe a sequence of events or a sequence of causation, starting with immunosuppression from corticosteroids, leading to - which *could* lead to an infection, for example, like pneumonia, which then that infection *could* then *possibly* be the trigger that would manifest Crohn's in somebody predisposed to Crohn's."  (Weiner Dep. 105:18-106:1)(emphasis added); see also id. at 106:13-107:20 (agreeing with plaintiff's counsel that the alleged steroids "*could* lead to the manifestation of Crohn's in somebody already predisposed to Crohn's")(emphasis added).  Moreover, Dr. Weiner confirms his doubt regarding the role steroids played in Kaiter's Crohn's manifestation, stating to a reasonable degree of probability in his expert report that, "the corticosteroids and nonsteroidal medications certainly *could have* had an impact on his bowel disease." (Dr. Weiner Expert Rep. 1, Jan. 21, 2003.)(emphasis added).

The evidence set forth in the text of Kaiter's brief, as well as the evidence quoted above, is insufficient to permit a jury to conclude Defendants' alleged administration of steroids probably caused his Crohn's manifestation.  Although Kaiter may have other evidence overcoming the reasonable probability threshold in regard to the cause of his

27

Crohn's manifestation, he has failed to draw my attention to it.  <u>Garrison v. Gambro</u>, 428 F.3d 933, 935 (10th Cir. 2005)(nonmovant's burden on summary judgment is to show specific facts demonstrating genuine issue for trial).  Significantly, although Kaiter's cites to the record are legion, and I have read those cites, I will not comb through the entire record in search of evidence supporting Crohn's causation, nor am I obligated to do so. <u>Mitchell v. City of Moore</u>, 218 F.3d 1190, 1199 (10th Cir. 2000)(court not required to search beyond referenced portions of the record in evaluating merits of summary judgment).

I GRANT Defendants' motion for summary judgment in regard to the cause of Kaiter's Crohn's colitis manifestation.

### Defendants' Claims for Attorney Fees

Defendants assert they are entitled to their attorney fees in accordance with Fed. R. Civ. P. 11 and 28 U.S.C. § 1927.  "Rule 11 sanctions are appropriate where it is patently clear that a claim has absolutely no chance of success under the existing precedents . . . ."  <u>Harrison v. Luse</u>, 760 F. Supp. 1394, 1399 (D. Colo. 1991).  Similarly, 28 U.S.C. § 1927 imposes a duty on a lawyer to refrain from "unreasonably and vexatiously" maintaining a position after it is clear such position is unfounded.  <u>Id.</u> at 1400.

Here, Strock's claims are reasonable in light of the facts and legal theories in which they are framed, and as such, do not violate any of the aforementioned authority.  Likewise, as evidenced by his claims surviving summary judgment, Kaiter's claims are

also reasonable under the circumstances.  Accordingly, Defendants' claims for attorney fees are DENIED.

## Conclusion

The motions to strike are DENIED.  Plaintiff Strock successfully demonstrates genuine issues of material fact as to the statute of limitations and causation challenges. While Kaiter successfully shows a genuine issue exists regarding the statute of limitations challenge and the causation challenge to his lung infection, his evidence is insufficient as a matter of law to permit a reasonable jury to conclude Defendants caused his Crohn's manifestation.  Thus, Defendants' motions for summary judgment are GRANTED in part and DENIED in part.

After assessing Plaintiffs' evidence in opposition to summary judgment, I am concerned much of Plaintiffs' evidence will fail to withstand Daubert scrutiny.  To this end, on or before May 26, 2006, each party shall file a designation of experts who will be called to testify at trial.  On or before June 15, 2006, each party shall file whatever motions to disqualify experts pursuant to the Daubert line of cases.  Written responses to those motions shall be filed not later than June 29, 2006.  Any such motion requiring an evidentiary hearing will be set for hearing in August 2006.  If such a motion is not filed with respect to any witness in accordance with this Order, objections to that witness pursuant to the Daubert line of cases will be deemed waived.

The parties are advised that the provisions of Local Rule 7.1(A) apply to Daubert motions and I expect and require that counsel meet and confer as to each such motion

before filing.  The parties' conference should include the identification of such document

and specific transcript references deemed necessary to present or respond to each such

motion.

Dated this 8th day of May, 2005.

BY THE COURT:

s/**John L. Kane**
Senior Judge, United States District Court
